# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

EUSEBIO AVILA
2152 Wildwood Drive
Gainesville, Georgia 30507,

ASHLEY SCOTT
10 Ike and Sal Place
Midway, Alabama 36053,

Individually and on behalf of all other
similarly situated individuals,

    Plaintiffs,

v.

PERDUE FARMS, INC.
31149 Old Ocean City Road
Salisbury, Maryland 21804,
County of Residence: Wicomico County

PERDUE FOODS LLC
31149 Old Ocean City Road
Salisbury, Maryland 21804,
County of Residence: Wicomico County

TYSON FOODS, INC.
2200 West Don Tyson Parkway
Springdale, Arizona 72762,

TYSON PREPARED FOODS, INC.
2200 West Don Tyson Parkway
Springdale, Arizona 72762,

THE HILLSHIRE BRANDS COMPANY
400 S. Jefferson Street
Chicago, Illinois 60607,

TYSON FRESH MEATS, INC.
800 Stevens Port Drive
Dakota Dunes, South Dakota 57049,

Civil Action No.: _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

TYSON PROCESSING SERVICES, INC.
2200 West Don Tyson Parkway
Springdale, Arizona 72762,

TYSON REFRIGERATED PROCESSED
MEATS, INC.
2200 West Don Tyson Parkway
Springdale, Arizona 72762,

KEYSTONE FOODS, LLC
905 Airport Road, Suite 400
West Chester, Pennsylvania 19380

EQUITY GROUP EUFAULA
DIVISION LLC
57 Melvin Clark Road
Bakerhill, Alabama 36027,

EQUITY GROUP-GEORGIA
DIVISION LLC
7200 Highway 19
P.O. Box 369
Camilla, Georgia 31730,

EQUITY GROUP KENTUCKY
DIVISION LLC
2294 KY Highway 90 W
Albany, Kentucky 42602,

PILGRIM'S PRIDE CORPORATION
1770 Promontory Circle
Greeley, Colorado 80634,

PILGRIM'S PRIDE CORPORATION OF
WEST VIRGINIA, INC.
129 Potomac Avenue
Moorfield, West Virginia 26836,

SANDERSON FARMS, INC.
127 Flynt Road
Laurel, Mississippi 39443,

SANDERSON FARMS, INC.
(PROCESSING DIVISION)
127 Flynt Road
Laurel, Mississippi 39443,

SANDERSON FARMS, INC.
(FOODS DIVISION)
127 Flynt Road
Laurel, Mississippi 39443,

KOCH FOODS, INC.
1300 West Higgins Road, Suite 100
Park Ridge, Illinois 60068,

KOCH FOODS OF GADSDEN LLC
501 Paden Road
Gadsden, Alabama 35903,

KOCH FOODS OF CUMMING LLC
221 Meadow Drive
Cumming, Georgia 30040-2691,

KOCH FOODS OF GAINESVILLE LLC
950 Industrial Boulevard
Gainesville, Georgia 30501-6746,

KOCH FOODS OF MISSISSIPPI LLC
4688 Highway 80 East
Morton, Mississippi 39117,

KOCH FOODS OF ALABAMA LLC
3500 West Boulevard
Montgomery, Alabama 36108,

KOCH FOODS OF ASHLAND LLC
515 Tyson Road
Ashland, Alabama 36251,

KOCH FOODS LLC
1835 Kerr Street
Chattanooga, Tennessee 37408-2017,

JCG FOODS OF ALABAMA LLC
1300 West Higgins Road, Suite 100
Park Ridge, Illinois 60068,

JCG FOODS OF GEORGIA LLC
1300 West Higgins Road, Suite 100
Park Ridge, Illinois 60068,

JCG INDUSTRIES, INC.
1300 West Higgins Road, Suite 100
Park Ridge, Illinois 60068,

WAYNE FARMS, LLC
4110 Continental Drive
Oakwood, Georgia 30566,

WFSP FOODS, LLC
112 Plugs Drive
Decatur, Alabama 35601,

MOUNTAIRE FARMS, INC.
29005 John J. Williams Highway
Millsboro, Delaware 19966,

MOUNTAIRE FARMS OF DELAWARE,
INC.
29005 John J. Williams Highway
Millsboro, Delaware 19966,

PECO FOODS INC.
1101 Greensboro Avenue
Tuscaloosa, Alabama 35401,

SIMMONS FOODS, INC.
601 North Hico Street
Siloam Springs, Arizona 72761,

SIMMONS PREPARED FOODS, INC.
601 North Hico Street
Siloam Springs, Arizona 72761,

FIELDALE FARMS CORPORATION
555 Broiler Boulevard
Baldwin, Georgia 30511,

GEORGE'S INC.
402 West Robinson Avenue
Springdale, Arizona 72764,

OZARK MOUNTAIN POULTRY, INC.
1000 North 2nd Street
Rogers, Arizona 72756,

GEORGE'S CHICKEN, LLC
19992 Senedo Road
Edinburg, Virginia 22824,

GEORGE'S FOODS, LLC
19992 Senedo Road
Edinburg, Virginia 22824,

GEORGE'S PROCESSING, INC.
402 West Robinson Avenue
Springdale, Arizona 72764,

HOUSE OF RAEFORD FARMS, INC.
3425 U.S. Hwy 117 South
Rose Hill, North Carolina 28458,

HOUSE OF RAEFORD FARMS OF
LOUISIANA, LLC
3867 2nd Street
Shreveport, Louisiana 71101,

O.K. FOODS, INC.
4601 North Sixth Street
Fort Smith, Arizona 72904,

HARRISON POULTRY, INC.
107 East Star Street
Bethlehem, Georgia 30620,

MAR-JAC POULTRY, INC.
1020 Aviation Boulevard
Gainesville, Georgia 30501,

MAR-JAC POULTRY LLC
1020 Aviation Boulevard
Gainesville, Georgia 30501,

MAR-JAC POULTRY MS, LLC
1301 James Street
Hattiesburg, Mississippi 39401,

MAR-JAC POULTRY AL, LLC
3301 2nd Place South
Jasper, Alabama 35501,

MAR-JAC HOLDINGS, INC.
1020 Aviation Boulevard
Gainesville, Georgia 30501,

AMICK FARMS, LLC
2079 Batesburg Highway
Batesburg, South Carolina 29006,

CASE FOODS, INC.
385 Pilch Road
Troutman, North Carolina 28166,

CASE FARMS PROCESSING, INC.
385 Pilch Road
Troutman, North Carolina 28166,

ALLEN HARIM FOODS, LLC
29984 Pinnacle Way
Millsboro, Delaware 19966,

AGRI STATS, INC.
6510 Mutual Drive
Fort Wayne, Indiana 46825,

and

WEBBER, MENG, SAHL AND
COMPANY, INC. d/b/a WMS AND
COMPANY INC.
1200 East High Street, Suite 104
Pottstown, Pennsylvania 19464,

                    Defendants.

Plaintiffs Eusebio Avila and Ashley Scott, individually and on behalf of a class of all those similarly situated (the "Class"), bring this civil antitrust action against Defendants[1] ("Defendants" collectively refers to those entities listed below in Footnote 1, and includes both "Defendant Processors" and "Defendant Consulting Firms," defined *infra*). These allegations are based on publicly available materials, including a recently filed antitrust class action complaint[2] (herein referred to as the "*Jien* Complaint"), knowledge, information, and belief.

## NATURE OF ACTION

1.      This class action alleges that beginning no later than January 1, 2009 until the present (the "Class Period"), Defendants conspired to unreasonably restrain competition for all persons employed by Defendant Processors as non-supervisory production and maintenance workers at chicken processing plants in the continental United States ("Class Members"[3]) in

---

[1] The term "Defendants" herein refers to the following companies: Perdue Farms, Inc.; Perdue Foods LLC; Tyson Foods, Inc.; Tyson Prepared Foods, Inc.; The Hillshire Brands Company; Tyson Fresh Meats, Inc.; Tyson Processing Services, Inc.; Tyson Refrigerated Processed Meats, Inc.; Keystone Foods, LLC; Equity Group Eufaula Division LLC; Equity Group—Georgia Division LLC; Equity Group Kentucky Division LLC; Pilgrim's Pride Corporation; Pilgrim's Pride Corporation of West Virginia, Inc.; Sanderson Farms, Inc.; Sanderson Farms, Inc. (Foods Division); Sanderson Farms, Inc. (Processing Division); JCG Foods of Alabama LLC; JCG Foods of Georgia LLC; JCG Industries, Inc.; Koch Foods, Inc.;Koch Foods LLC; Koch Foods of Alabama LLC; Koch Foods of Ashland LLC; Koch Foods of Gadsden LLC; Koch Foods of Cumming LLC; Koch Foods of Gainesville LLC; Koch Foods of Mississippi LLC; Wayne Farms, LLC; WFSP Foods, LLC; Mountaire Farms, Inc.; Mountaire Farms of Delaware, Inc.; Peco Foods Inc.; Simmons Foods, Inc.; Simmons Prepared Foods, Inc.; Fieldale Farms Corporation; George's, Inc.; Ozark Mountain Poultry, Inc.; George's Chicken, LLC; George's Foods, LLC; George's Processing, Inc.; House of Raeford Farms, Inc.; House of Raeford Farms of Louisiana, LLC; O.K. Foods, Inc.; Harrison Poultry, Inc.; Mar-Jac Poultry, Inc.; Mar-Jac Poultry MS, LLC; Mar-Jac Poultry AL, LLC; Mar-Jac Poultry, LLC; Mar-Jac Holdings, Inc.; Amick Farms, LLC; Case Foods, Inc.; Case Farms Processing, Inc.; Allen Harim Foods, LLC; Agri Stats, Inc.; and Webber, Meng, Sahl and Company, Inc.

[2] *Jien, et al. v. Perdue Farms, Inc*., et al., No. 1:19-cv-02521-SAG (D. Md. Aug. 30, 2019).

[3] Class Members include all natural persons employed by Defendant Processors and their co-conspirators as non-supervisory production and maintenance workers at chicken processing plants

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants' scheme had the effect of depressing wages and benefits paid to Class Members while maximizing the profits earned by Defendants.

2.     Defendants accomplished their anticompetitive scheme by engaging in reoccurring, secret meetings where they agreed on specific wages and benefits paid to Class Members. Additionally, Defendants utilized the services of two consulting firms to facilitate the scheme, and to monitor and enforce the effects of the conspiracy.

3.     Defendants are 18 chicken processing companies and many of their subsidiaries and affiliates ("Defendant Processors"), representing more than 90 percent of the total broiler[4] producing companies in the United States, as well as two consulting firms, Agri Stats, Inc. ("Agri Stats") and Webber, Meng, Sahl and Company, Inc. d/b/a WMS and Company Inc. ("WMS") (together "Defendant Consulting Firms"). During the Class Period, Defendant Consulting Firms helped to facilitate the exchange of competitively sensitive compensation data among the Defendant Processors.

4.     Defendant Processors own and operate approximately 180 chicken processing plants in the continental United States. These chicken processing plants have employed hundreds of thousands of Class Members in various positions involved in processing live chicken, including slaughtering birds and preparing the poultry for sale to retailers and consumers. Other employees repair machines and conduct other maintenance at the processing plants.

---

in the continental United States from January 1, 2009 until the present. Excluded from the Class are: office clerical employees, guards, watchmen, foremen, salespeople, supervisors and executives employed by Defendant Processors; Defendants; co-conspirators and any of their subsidiaries, predecessors, officers, or directors or trustees; and federal, state or local government entities.

[4] A "broiler" is a chicken specifically bred for meat production (as opposed to egg production).

5.      Class Members are compensated via hourly wages and benefits based on the Class Member's specific position and years of experience as determined by a schedule of wage rates and employment benefits established by senior executives and approved by each Defendant Processor's respective corporate headquarters.

6.      According to the *Jien* complaint, Defendants participated in reoccurring, secret in person meetings between senior executives, including human resources executives and directors of compensation, which were held at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida. During these meetings, Defendants exchanged competitively sensitive information, and agreed to depress wages and benefits to Class Members at artificially low levels.

7.      Defendant Processors also exchanged detailed non-public, timely and competitively sensitive wage data provided to them by Defendant Consulting Firms to facilitate their conspiracy. Agri Stats collects data from, and then distributes monthly reports to, each Defendant Processor providing them with current information regarding the hourly wages of the different chicken processing plant workers. In turn, Defendant Processors use those reports to inform and fix wages and benefits. WMS operates in a similar manner by conducting a survey relating to wages and benefits paid by each Defendant Processor on an annual basis, and circulates the results to senior executives of Defendant Processors. Although the data exchanged by Agri Stats and WMS is intended to be anonymous, it is detailed enough to enable Defendant Processors to easily match the information to specific plants in order to ensure that no conspirator deviates from the fixed wage and benefit rates.

8.      The chicken processing industry has a number of characteristics that assisted the formation and implementation of the conspiracy. These include, but are not limited to: (1) vertical integration; (2) high barriers to entry; (3) inelastic labor supply; (4) industry concentration; (5)

fungibility of chicken processing plant labor; (6) numerous opportunities to collude; (7) close professional networks; and (8) a history of government investigations into collusive actions.

9.     The anticompetitive, conspiratorial conduct alleged herein had the intended and actual effect of depressing wages and benefits paid to Class Members below a competitive level. Despite high demand for a limited supply of skilled employees who have the relevant experience, Defendants' anticompetitive conduct substantially limited the chicken processing plant workers' access to better job opportunities, restricted their mobility, and deprived them of information useful in negotiating better terms of employment, including higher compensation.

10.     The agreements entered by Defendants to fix and depress wages and benefits unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. § 1. Plaintiffs, on behalf of themselves and on behalf of the Class, bring this antitrust action to enjoin Defendants from continuing their unlawful agreements.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover damages suffered by Plaintiffs and the Class Members for Defendants' violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs and the Class also seek attorneys' fees, costs, and other expenses under federal law.

12.     This Court also has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and 28 U.S.C. §§ 1331, 1337.

13.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has

been carried out in this District, and one or more Defendants reside, are doing business in, or transact business in this District. Specifically,

- Each of the Defendant Processors regularly sold chicken in the state of Maryland during the Class Period and continues to sell chicken in the state of Maryland;

- Defendants Perdue Farms, Inc. and Perdue Foods LLC are headquartered and incorporated in the state of Maryland;

- Defendant The Hillshire Brands Company is incorporated in Maryland;

- Defendants Amick Farms, LLC; Perdue Farms, Inc.; Perdue Foods LLC; and Allen Harim Foods, LLC operated chicken processing plants in the state of Maryland during the Class Period and provided compensation to Class Members in those plants at depressed rates as a result of the conspiracy among all Defendants alleged herein;

- Defendants Amick Farms, LLC; Perdue Farms, Inc.; Perdue Foods LLC; Mountaire Farms, Inc.; Tyson Foods, Inc.; Case Foods, Inc.; and Allen Harim Foods, LLC have employees located in the state of Maryland;

- Defendant Consulting Firms regularly provided services to Defendant Processors in the state of Maryland during the Class Period, including to Perdue Farms, Inc. and Perdue Foods LLC; and

- The leading trade associations representing the chicken processing industry—the National Chicken Council and the U.S. Poultry & Egg Association—held meetings in the state of Maryland during the Class Period that were attended by Defendant Processors, such as the three-day "Chicken Media Summit" that was held in Cambridge, Maryland in April 2015.

14.     Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their substantial contacts with the State of Maryland, including contacts in furtherance of the conspiracy alleged herein.

15.     Defendants, directly or through their agents, subsidiaries, affiliates, or parents may be found in and transact business in the forum state.

## PARTIES

### Plaintiffs

16.     Plaintiff Eusebio Avila was employed as a laborer, machine operator, and inventory clerk at a chicken processing plant operated by Fieldale Farms Corporation in Gainesville, Georgia, during the Class Period. He is a resident of the state of Georgia.

17.     Plaintiff Ashley Scott was employed in the production line and later in quality assurance at a chicken processing plant operated by Equity Group Eufaula Division, LLC in Alabama, during the Class Period. She is a resident of the state of Alabama.

18.     As a result of the conspiracy as alleged herein, Plaintiffs earned less in wages and benefits than they would have earned absent the alleged conspiracy.

### Defendants

19.     Perdue Farms, Inc. is a privately-held Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

20.     Perdue Foods LLC is a privately-held Maryland limited liability company headquartered in Salisbury, Maryland. Perdue Foods LLC is a subsidiary of Perdue Farms, Inc. During the Class Period, Perdue Foods LLC and/or its predecessors, wholly-owned or controlled

subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

21.     Defendants Perdue Farms, Inc. and Perdue Foods LLC are collectively referred to herein as "Perdue."

22.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

23.     Tyson Prepared Foods, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

24.     The Hillshire Brands Company is a Maryland corporation located in Chicago, Illinois, and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Hillshire Brands Company and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

25.     Tyson Fresh Meats, Inc. is a Delaware corporation located in Dakota Dunes, South Dakota, and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Fresh Meats, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

26.     Tyson Processing Services, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson

Processing Services, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

27.     Tyson Refrigerated Processed Meats, Inc. is a Delaware corporation located in Springdale, Arkansas, and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Refrigerated Processed Meats, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

28.     Keystone Foods, LLC is a Delaware corporation located in West Chester, Pennsylvania, and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Keystone Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

29.     Equity Group Eufaula Division LLC is a Delaware corporation located in Bakerhill, Alabama, and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Equity Group Eufaula Division LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

30.     Equity Group Georgia Division LLC is a Delaware corporation located in Camilla, Georgia, and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Equity Group Georgia Division LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

31.     Equity Group Kentucky Division LLC is a Delaware corporation located in Albany, Kentucky, and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Equity Group Kentucky Division LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

32.     Defendants Tyson Foods, Inc.; Tyson Prepared Foods, Inc.; The Hillshire Brands Company; Tyson Fresh Meats, Inc.; Tyson Processing Services, Inc.; Tyson Refrigerated Processed Meats, Inc.; Keystone Foods, LLC; Equity Group Eufaula Division LLC; Equity Group Georgia Division LLC; and Equity Group Kentucky Division LLC are collectively referred to as "Tyson."

33.     Pilgrim's Pride Corporation is a Delaware corporation headquartered in Greeley, Colorado. JBS USA Holdings, Inc. holds a 75.3% controlling interest in Pilgrim's Pride Corporation. JBS USA Holdings and Pilgrim's Pride Corporation are subsidiaries of JBS S.A., a Brazilian corporation headquartered in Sao Paulo, Brazil. During the Class Period, Pilgrim's Pride Corporation and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

34.     Pilgrim's Pride Corporation filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Texas in or around December 1, 2008. Pilgrim's Pride Corporation was discharged from bankruptcy (effective December 28, 2009) under a plan of reorganization that paid all creditors in full. Pilgrim's Pride Corporation participated in the conspiracy alleged herein throughout the Class Period, including before and after its discharge from bankruptcy.

35.     This Complaint seeks to recover damages from Pilgrim's Pride Corporation only for Pilgrim's Pride Corporation's post-discharge conduct, and in no way seeks to violate any orders of the above referenced Bankruptcy Court. However, by operation of law, the damages arising from Pilgrim's Pride Corporation's post-discharge conduct include damages incurred by Plaintiffs and the other Class Members throughout the Class Period. This Complaint also seeks to recover

damages from the other Defendants for Pilgrim's Pride Corporation's pre-discharge conspiratorial conduct.

36.     Pilgrim's Pride Corporation of West Virginia, Inc. is a West Virginia corporation located in Moorefield, West Virginia, and is a wholly-owned subsidiary of Pilgrim's Pride Corporation. During the Class Period, Pilgrim's Pride Corporation of West Virginia, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

37.     Defendants Pilgrim's Pride Corporation and Pilgrim's Pride Corporation of West Virginia, Inc. are collectively referred to herein as "Pilgrim's."

38.     Sanderson Farms, Inc. is a publicly held Mississippi corporation headquartered in Laurel, Mississippi. During the Class Period, Sanderson Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

39.     Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly-owned subsidiary of Sanderson Farms, Inc. During the Class Period, Sanderson Farms, Inc. (Foods Division) and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

40.     Sanderson Farms, Inc. (Processing Division) is a Mississippi corporation located in Laurel, Mississippi, and is a wholly-owned subsidiary of Sanderson Farms, Inc. During the Class Period, Sanderson Farms, Inc. (Processing Division) and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

41.     Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), and Sanderson Farms, Inc. (Processing Division) are collectively referred herein to as "Sanderson Farms."

42.     Koch Foods, Inc. is a privately-held Delaware corporation with its corporate headquarters in Park Ridge, Illinois. During the Class Period, Koch Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

43.     JCG Foods of Alabama LLC is an Alabama corporation with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, JCG Foods of Alabama LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

44.     JCG Foods of Georgia LLC is a Georgia corporation with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, JCG Foods of Georgia LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

45.     JCG Industries, Inc. is an Illinois corporation with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, JCG Industries, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

46.     Koch Foods LLC is a Tennessee corporation with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch

Foods LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

47.     Koch Foods of Alabama LLC is an Alabama corporation with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods of Alabama LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

48.     Koch Foods of Ashland LLC is an Alabama corporation located in Ashland, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods of Ashland LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

49.     Koch Foods of Gadsden LLC is an Alabama corporation located in Gadsden, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods of Gadsden LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

50.     Koch Foods of Cumming LLC is a Georgia corporation with its headquarters in Cumming, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods of Cumming LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

51.     Koch Foods of Gainesville LLC is a Georgia corporation with its headquarters in Gainesville, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods of Gainesville LLC and/or its predecessors, wholly-owned or controlled

subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

52.     Koch Foods of Mississippi LLC is a Mississippi corporation with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Foods of Mississippi LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

53.     Defendants Koch Foods, Inc.; JCG Foods of Alabama LLC; JCG Foods of Georgia LLC; JCG Industries, Inc.; Koch Foods LLC; Koch Foods of Alabama LLC; Koch Foods of Ashland LLC; Koch Foods of Gadsden LLC; Koch Foods of Cumming LLC; Koch Foods of Gainesville LLC; and Koch Foods of Mississippi LLC are collectively referred to herein as "Koch Foods."

54.     Wayne Farms, LLC is a Delaware corporation headquartered in Oakwood, Georgia. It is an affiliate of its parent company, Continental Grain Company, which is a privately-held company in Arlon, Belgium. During the Class Period, Wayne Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

55.     WFSP Foods, LLC is a Georgia corporation with its headquarters in Decatur, Alabama, and is a wholly-owned subsidiary of Wayne Farms, LLC. During the Class Period, WFSP Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

56.     Defendants Wayne Farms, LLC and WFSP Foods, LLC are collectively referred to herein as "Wayne Farms."

57.     Mountaire Farms, Inc. is a privately-held Delaware corporation with its headquarters in Millsboro, Delaware. During the Class Period, Mountaire Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

58.     Mountaire Farms of Delaware, Inc. is a privately-held Delaware corporation located in Millsboro, Delaware, and is a wholly-owned subsidiary of Mountaire Farms, Inc. During the Class Period, Mountaire Farms of Delaware, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

59.     Defendants Mountaire Farms, Inc. and Mountaire Farms of Delaware, Inc. are collectively referred to herein as "Mountaire."

60.     Peco Foods Inc. is a privately-held Alabama corporation headquartered in Tuscaloosa, Alabama. During the Class Period, Peco Foods Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

61.     Simmons Foods, Inc. is a privately-held Arkansas corporation headquartered in Siloam Springs, Arkansas. During the Class Period, Simmons Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

62.     Simmons Prepared Foods, Inc. is a privately-held Arkansas company headquartered in Siloam Springs, Arkansas, and is a wholly-owned subsidiary of Simmons Foods, Inc. Simmons Prepared Foods, Inc. and/or its predecessors, wholly-owned or controlled

subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

63.     Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to herein as "Simmons" or "Simmons Foods."

64.     Fieldale Farms Corporation is a privately-held Georgia corporation headquartered in Baldwin, Georgia. During the Class Period, Fieldale Farms Corporation and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

65.     George's, Inc. is a privately-held Arkansas corporation headquartered in Springdale, Arkansas. During the Class Period, George's, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

66.     Ozark Mountain Poultry, Inc. is an Arkansas corporation headquartered in Rogers, Arkansas, and is a wholly-owned subsidiary of George's, Inc. During the Class Period, Ozark Mountain Poultry, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

67.     George's Chicken, LLC is a Virginia corporation headquartered in Edinburg, Virginia, and is a wholly-owned subsidiary of George's, Inc. During the Class Period, George's Chicken, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

68.     George's Foods, LLC is a Virginia corporation headquartered in Edinburg, Virginia, and is a wholly-owned subsidiary of George's, Inc. During the Class Period, George's

Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

69.     George's Processing, Inc. is an Arkansas corporation headquartered in Springdale, Arkansas, and is a wholly-owned subsidiary of George's, Inc. During the Class Period, George's Processing, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

70.     Defendants George's, Inc.; Ozark Mountain Poultry, Inc.; George's Chicken, LLC; George's Foods, LLC; and George's Processing, Inc. are collectively referred to herein as "George's."

71.     House of Raeford Farms, Inc. is a privately-held North Carolina corporation headquartered in Rose Hill, North Carolina. During the Class Period, House of Raeford Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

72.     House of Raeford Farms of Louisiana, LLC is a Louisiana corporation headquartered in Shreveport, Louisiana, and is a wholly-owned subsidiary of House of Raeford Farms, Inc. During the Class Period, House of Raeford Farms of Louisiana, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

73.     Defendants House of Raeford Farms, Inc. and House of Raeford Farms of Louisiana, LLC are collectively referred to herein as "House of Raeford."

74.     Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas. O.K. Foods, Inc. is a subsidiary of Industrias Bachoco S.A. de C.V., a Mexican corporation headquartered in Celaya, Mexico. During the Class Period, O.K. Foods, Inc. and/or its

16

predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

75.     Harrison Poultry, Inc. is a Georgia corporation located in Bethlehem, Georgia. During the Class Period, Harrison Poultry, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

76.     Mar-Jac Poultry, Inc. is a Georgia corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

77.     Mar-Jac Poultry MS, LLC is a Mississippi limited liability corporation located in Hattiesburg, Mississippi. During the Class Period, Mar-Jac Poultry MS, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

78.     Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Jasper, Alabama. During the Class Period, Mar-Jac Poultry AL, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

79.     Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville, Georgia. During the Class Period, Mar-Jac Poultry, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

80. Mar-Jac Holdings, Inc. is a Delaware corporation located in Gainesville, Georgia and is the parent company of Mar-Jac Poultry, Inc.; Mar Jac Poultry MS, LLC; Mar-Jac Poultry AL, LLC; and Mar-Jac Poultry, LLC. During the Class Period, Mar-Jac Holdings, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

81. Defendants Mar-Jac Poultry, Inc.; Mar-Jac Poultry MS, LLC; Mar-Jac Poultry AL, LLC; Mar-Jac Poultry, LLC; and Mar-Jac Holdings, Inc. are collectively referred to herein as "Mar-Jac Poultry."

82. Amick Farms, LLC is a privately-held Delaware limited liability company with its corporate headquarters in Batesburg, South Carolina. Amick Farms, LLC is a wholly-owned subsidiary of OSI Group, LLC, a privately-held Delaware corporation with its corporate headquarters in Aurora, Illinois. During the Class Period, Amick Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

83. Case Foods, Inc. is a privately-held Delaware corporation with its corporate headquarters in Troutman, North Carolina. During the Class Period, Case Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

84. Case Farms Processing, Inc. is a privately-held North Carolina corporation with its corporate headquarters in Troutman, North Carolina, and is a wholly-owned subsidiary of Case Foods, Inc. During the Class Period, Case Farms Processing, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

85.     Defendants Case Foods, Inc. and Case Farms Processing, Inc. are collectively referred to herein as "Case Foods."

86.     Allen Harim Foods, LLC is a Delaware company with its corporate headquarters in Millsboro, Delaware. During the Class Period, Allen Harim Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to Class Members in the United States.

87.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co. Eli Lilly & Co. is an Indiana corporation located in Indianapolis, Indiana. Throughout the Class Period, Agri Stats, which purports to be a third-party data aggregation service, served as a conduit by which the conspiracy shared, *inter alia*, detailed, timely, competitively sensitive, and non-public wage and benefit data among Defendant Processors and their co-conspirators.

88.     Webber, Meng, Sahl and Company, Inc. d/b/a WMS and Company Inc. is a Pennsylvania corporation located in Pottstown, Pennsylvania. Throughout the Class Period, WMS facilitated, through its subscription services and other means, the exchange of confidential, proprietary, and competitively sensitive compensation data among Defendant Processors and their co-conspirators.

## AGENTS AND CO-CONSPIRATORS

89.     The following named entities have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy:

a.      Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia.  During the Class Period, Claxton Poultry Farms, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages

19

and/or benefits to non-supervisory production and maintenance workers at chicken processing plants in the continental United States.

b.      Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the Class Period, Norman W. Fries, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to non-supervisory production and maintenance workers at chicken processing plants in the continental United States.

c.      Foster Farms, LLC is a privately-held California corporation headquartered in Livingston, California. During the Class Period, Foster Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to non-supervisory production and maintenance workers at chicken processing plants in the continental United States.

d.      Foster Poultry Farms is a privately-held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms, LLC. During the Class Period, Foster Poultry Farms and/or its predecessors, wholly-owned or controlled subsidiaries, or other affiliates employed and paid wages and/or benefits to non-supervisory production and maintenance workers at chicken processing plants in the continental United States.

90.     Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

91.     Each Defendant and co-conspirator named herein acted as the agent for, or participated in a joint venture with, the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged herein.

## INTERSTATE COMMERCE

92.     Defendant Consulting Firms Agri Stats and WMS provided services to Defendant Processors located in multiple different states and upon information and belief exchanged confidential, proprietary, and competitively sensitive data among Defendant Processors across state lines.

93.     The activities of Defendants and co-conspirators were within the flow of interstate commerce of the continental United States, and were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the continental United States.

94.     Defendants' conduct substantially affected interstate commerce throughout the continental United States and caused antitrust injury throughout the continental United States because Defendants have employees across state lines. Defendants also conducted business across state lines.

95.     Defendants' conduct was intended to depress, and did in fact depress, the wages and benefits of Class Members nationwide, and restrained competition for the hiring of Class Members, many of whom were located in states other than the states in which their place of employment was.

96.     Defendant Processors and co-conspirators paid Class Members by mailing or transmitting funds across state lines.

97.     Class Members were and continue to be employed by Defendant Processors and co-conspirators to process chicken for sale in interstate and foreign commerce.

# FACTUAL BACKGROUND

## A. Background

### 1. The Chicken Industry

98.     Americans eat more chicken than any other protein in the United States, consuming an estimated 90 pounds of chicken each year for the last five years, according to the National Chicken Council.

99.     The companies that process "chickens for consumption" typically slaughter and process these chickens before the age of 13 weeks. According to a 2012 report by Focus Management Group, chickens processed for consumption "are a commodity product with little or no product differentiation based on the processors."

100.    Chickens processed for consumption are sold in various forms, including fresh, frozen, or cooked, whole or in parts after further processing such as cutting, deboning, or blending as a meat ingredient in a value-added product.

### 2. Chicken Processing Plant Operations

101.    Defendant Processors currently own approximately 180 chicken processing plants representing more than 90 percent of the total broiler producing companies in the continental United States. In 2018, Defendant Processors earned at least $21.8 billion in revenue from the sale of processed chicken.

102.    Historically, different commercial companies owned and controlled the various stages of chicken processing, including: hatcheries, where eggs are hatched; growers, which raise the hatched chickens; feed mills, which produce and supply food products for the chickens; and processing plants, where live chickens are slaughtered and turned into poultry products for sale and consumption. Today, chicken processing companies are vertically integrated to encompass

every aspect of chicken production under the sole control of single companies. Figure 1 below depicts the different stages of chicken processing.

**Figure 1**



(source:   http://www.focusmg.com/wordpress/wp-content/uploads/2016/12/Poultry-Processing-Economic-Review-eBook-2016-1.pdf)

103.    As shown above, at the processing plant stage, chickens are typically processed in two kinds of facilities. First, slaughterhouse facilities kill live chickens and convert the carcasses

into raw chicken products. Second, further processing facilities conduct additional processing such as cutting, deboning, breading, and cooking to convert the raw chicken into a value-added form for sale.

104.    Because chicken products are produced in a vertically integrated manner, processing facilities contain similar equipment and have standardized production practices that result in Defendant Processors having highly similar operations and procedures.

105.    Most of Defendant Processors' chicken processing plants are located in the Southeastern area of the continental United States. Figure 2 below identifies the locations of Defendant Processors' current chicken processing plants.

**Figure 2**



106.    Chicken processing plants are typically located near the growers with whom they contract for their supply of live chickens. Many of Defendant Processors' chicken processing plants are clustered in groups in rural areas, particularly along the 'poultry belt' of the South, which

consists of Georgia, Arkansas, Mississippi, Alabama, and North Carolina. For example, Northwest Arkansas, including the non-metropolitan areas around Fayetteville, Springdale and Fort Smith, hosts the third and fourth highest concentrations of jobs in poultry cutting and trimming in the entire country, with more than 12 poultry cutters for every 1,000 total jobs. Further, the small regional area of Gainesville, Georgia, has five different processing plants, owned by four different companies (Pilgrim's, Perdue, Mar-Jac and Fieldale Farms).

107.    In theory, this level of concentration, which is also reflected in other areas across the South, should make it easier for workers to switch to rival chicken processing plants in a competitive market where better compensation is offered. However, Defendants' anticompetitive conduct effectively restrained any labor movement by depressing wages and benefits at artificially low levels. This allowed Defendant Processors to reduce their labor costs while increasing profits.

### 3.    Chicken Processing Plant Positions

108.    Each year during the Class Period, Defendant Processors collectively employed hundreds of thousands of workers at their chicken processing plants. The Class is specifically comprised of those non-supervisory and maintenance workers employed by Defendant Processors in both slaughterhouse facilities and further processing facilities.

109.    Because of the integrated and standardized nature of modern chicken production, processing plants have highly similar labor requirements. Class Members employed by Defendant Processors are easily categorized into a limited set of job positions along the various stages of processing including hangers, who hang live chickens onto fast-moving metal hooks in preparation for slaughter; presenters, who remove the viscera from the body cavity and arrange them for USDA inspection; cone line feeders, who remove the carcasses from the shackles and insert them onto cones on a moving conveyer; eviscerators, who remove the internal organs from chicken carcasses;

and deboners, who remove bones from chicken carcasses. Figure 3 below depicts the various tasks

involved in processing chicken for consumption.

**Figure 3**



Process Flow Diagram: Young Chicken Slaughter

ªSteps in the process where nonmeat ingredients (e.g., antimicrobials) are added to or come in contact with product.

Source: U.S. Department of Agriculture (USDA), Food Safety and Inspection Service. September 1999. "Generic HACCP Model for Poultry Slaughter." HACCP-5. Washington, DC: USDA FSIS.

110.   Many of these tasks are so highly dangerous that the United States Department of

Labor classifies poultry processing as "a hazardous industry." According to Human Rights Watch,

in 2004 poultry workers were 14 times more likely than other workers to suffer debilitating injuries

resulting from repetitive trauma—like "claw hand" (where fingers lock and ganglion cysts of fluid deposit under the skin). Amputations are also common occurrences among poultry processing workers. In 2018, Deborah Berkowitz, Director at the National Employment Law Project, reported that a worker in a Peco Foods poultry plant in Pocahontas, Arkansas, suffered a work-related amputation. Three months later, the same company reported that another worker had suffered an amputation in the same plant.

111.    Today, poultry workers remain twice as likely to suffer serious workplace injuries and six times as likely to contract a workplace illness compared to other private sector employees, according to an article by National Public Radio (NPR) titled "Chicken Plants See Little Fallout From Immigration Raid" dated August 9, 2019. However, according to the Government Accountability Office ("GAO"), the number of injuries in the chicken industry are likely higher. Indeed, in 2016, the GAO found that Federal data likely does not capture the true number of injuries incurred by chicken processing plant workers because migrant and refugee workers are less likely to report injuries fearing deportation and retaliation.

### 4.    Demographics of Chicken Processing Plant Workers

112.    Foreign-born and non-citizens comprise 28.7 percent of all meat processing workers in the continental United States. This is largely because Defendant Processors, and other meat processing companies, recruit workers from overseas to fill jobs that Americans often decline due to poor working conditions and low compensation. In December 2017, *ProPublica* reported on a year-long investigation into the chicken industry, and found that chicken processing plants "rely heavily on unauthorized immigrants and refugees, often mistreating them, and in some cases, using their immigration status to get rid of workers who are injured or fight for better conditions."

113.    In a 2015 report, Oxfam America wrote: "[t]he poultry industry has a complicated history of tapping marginalized populations for its workforce. … Of the roughly 250,000 poultry workers in the US, most are minorities, immigrants, or refugees, and a significant percentage is female." In 2016, approximately 35.4% of poultry and other meat processing workers were Hispanic or Latino, 20.2% African American, and 8% Asian according to US Labor Force Statistics cited in a report by the Northwest Arkansas Worker's Justice Center.

114.    In a 2017 article titled "Exploitation and Abuse at the Chicken Plant," THE NEW YORKER reported that Defendant Processor Case Farms LLC frequently hired members of disadvantaged migrant groups in order to "keep labor costs down." This included Guatemalan workers, but after they "began to organize, Case Farms recruited Burmese refugees. Then it turned to ethnic Nepalis expelled from Bhutan, who today make up nearly 35 percent of the company's employees in Ohio."

115.    Given these demographics, many chicken processing plant workers do not have a high proficiency in English, and likely lack basic education. For example, the Midwest Center for Investigative Reporting interviewed one employee at Tyson's Sedalia plant who said that her mother, an immigrant who had worked at the plant for 20 years, was not promoted because Tyson "can't really have a manager that can't communicate with their co-workers." Accordingly, many chicken processing plant workers cannot easily obtain stable employment outside the chicken industry.

### 5.    Compensation of Chicken Processing Plant Workers

116.    Chicken processing plant workers comprise a significant share of the total operating costs of each Defendant Processor. According to a report prepared for the USDA in 2006, which reviewed the internal workings of the poultry processing industry, live poultry and packaging

28

materials are the primary inputs to poultry processing; however, to transform those inputs into finished goods, companies employ equipment, labor, and other materials. Live birds represent over 65 percent of the total production cost for both chicken and turkey slaughter plants, and labor accounts for approximately 15 percent of costs.

117.   Like many other positions in the labor market, chicken processing plant positions are typically paid according to the skill required for those positions. For example, positions involving more skill and experience such as "deboners" are paid more than other non-supervisory positions on the processing line.

118.   The compensation provided by Defendant Processors to Class Members is comprised of an hourly wage rate and other additional benefits. Those benefits usually include health care, paid time off, a retirement savings plan, disability insurance and life insurance, which each Defendant Processor quantifies into a specific dollar value.

119.   The Bureau of Labor Statistics reports that the annual mean wage of all meat and poultry processing workers in 2018 was $28,620, or $13.76 per hour. In 2017, employees working in chicken processing plants earned on average $13.58 per hour plus benefits. Oxfam America's report titled "Lives on the Line" states: "[m]ost workers on the poultry processing line earn wages that place them near or below the poverty line. Wages average around $11 per hour; annual income for most is between $20,000 and $25,000. The federal poverty level for a family of three in 2015 is $20,090; for a family of four it's $24,250." For example, in 2016, an Arkansas chicken processing plant worker earned an average of $13.84 per hour, or $28,792 annually, putting them just above the poverty line in the South.

Case 1:19-cv-03018-GLR   Document 1   Filed 10/16/19   Page 36 of 63


120.     Because Defendants artificially depressed wages and benefits paid to Class Members during the Class Period, many of those workers remained impoverished or close to the poverty line.

**B.      Conspiracy to Fix Wages**

121.     Beginning more than a decade ago, Defendants conspired with each other to fix and depress the wages and benefits paid to Class Members at Defendant Processors' chicken processing plants in the continental United States in order to reduce labor costs and maximize profits.

122.     Defendants engaged in the following anticompetitive conduct in furtherance of the formation, implementation, and enforcement of the conspiracy:

> a.      Conducting reoccurring, secret in-person meetings between senior executives of Defendant Processors. During these meetings, Defendants exchanged information and agreed to fix the wages and benefits paid to Class Members at artificially depressed levels; and

> b.      Frequently exchanging detailed, timely, competitively sensitive, and non-public wage data provided to one another through reports from Defendant Consulting Firms which enabled Defendants to continuously identify how much each Defendant Processor was paying chicken processing plant workers which was in turn used to depress wages and benefits paid to Class Members.

**6.      Secret In-Person Meetings to Fix Compensation**

123.     From at least January 2009 until the present, senior executives of Defendant Processors, including human resources executives and directors of compensation, conducted reoccurring, secret in-person meetings to exchange information. At these meetings, participants

discussed detailed, timely, non-public, and commercially sensitive compensation packages and agreed upon the wages and benefits to be paid to Class Members.

124.    According to the *Jien* Complaint, during each year of the Class Period, senior executives from Defendant Processors attended secret, in-person meetings at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida in order to discuss and fix wages. Although the meetings sometimes coincided with the U.S. Poultry & Egg Association's annual Human Resources Seminar, they were not part of any official schedule of events.

125.    At these secret meetings, the senior executives of Defendant Processors exchanged timely data regarding wages and benefits paid to Class Members through a comprehensive and detailed survey distributed among the group, as well as by holding in-person roundtable discussions in order to agree on wages and benefits paid to Class Members.

126.    During the Class Period, the surveys distributed to the group at the meetings were conducted by the consulting firm WMS. On its website, WMS states that it "offers many types of surveys from industry-specific compensation surveys to company-specific job content surveys. Unlike traditional surveys that yield ambiguous answers to generic questions, our company or industry-tailored assessments are based on real programs and issues within your organization or industry that result in answers based on real-time data."

127.    Prior to the annual meeting in Destin, Florida, each Defendant Processor provided WMS with detailed information about wages and benefits paid to Class Members, including current hourly rates for specific positions within the chicken processing plants as well as the total number of people employed in each respective position.

128.    The average and median wage rates for each chicken processing plant position were also circulated by WMS based on the data provided by Defendant Processors. This enabled Defendant Processors to establish a benchmark to help facilitate the wage-fixing discussions.

129.    After WMS circulated the survey data among the participants at the annual meetings in Destin, Florida, those senior executives used the information in roundtable discussions to agree upon the wages and benefits paid to chicken processing plant employees.

130.    The annual meetings in Destin, Florida also gave senior executives from Defendant Processors an opportunity to enforce and police the conspiracy.

131.    In addition, senior executives of Defendant Processors also attended in-person meetings sponsored by industry trade associations. These meetings presented participants with further opportunities to conspire on wages and benefits, as well as to enforce and police any arrangements already agreed to. These opportunities included:

**Seminars and Meetings of the U.S. Poultry & Egg Association**

a.    The U.S. Poultry & Egg Association describes itself as the world's largest and most active poultry organization, and each Defendant Processor is a member. Each year of the Class Period, the Association held a Human Resources Seminar, often at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida. Defendant Processors' employees responsible for setting plant worker wages—including senior executives, Vice Presidents of Human Resources, Directors of Compensation, Directors of Benefits, and Compensation Analysts—routinely attended the Human Resources Seminar.

**Board meetings of the National Chicken Council**

b.    The National Chicken Council exclusively represents chicken processors, and its members account for approximately 95 percent of the chicken sold in the United States. Each Defendant Processor is a member of the National Chicken Council.  The CEOs of Defendant Processors serve on the board of directors of the National Chicken Council, and that board of directors met at least four times a year during the Class Period. In conjunction with some of these meetings, executives from Agri Stats made presentations, and the CEOs of Defendant Processors held private dinners.

**Meetings of the Joint Poultry Industry Human Resources Council**

c.     This Council was formed by merging the human resources committees of the U.S. Poultry & Egg Association, National Chicken Council and the National Turkey Federation. The Council is comprised of senior human resources executives, including executives of Defendant Processors who formed and implemented the wage-fixing conspiracy. The Council exclusively focuses on labor issues, such as wages and benefits, and it held an in-person meeting on an annual basis during the Class Period, often at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida.

**Meetings of the Georgia Poultry Federation**

d.     The Georgia Poultry Federation "is a non-profit trade association which represents the poultry industry in Georgia, the nation's leading broiler[5] producing state." Many of the Defendant Processors are members of the Georgia Poultry Federation. It held meetings at least three times a year during the Class Period, which were attended by executives from Defendant Processors.

**Meetings of the North Carolina Poultry Federation**

e.     The mission of the North Carolina Poultry Federation "is to create a favorable climate for business success for everyone involved in the poultry industry in North Carolina." Many of the Defendant Processors are members of the North Carolina Poultry Federation. It conducted several meetings during each year of the Class Period, which were attended by executives of Defendant Processors.

**Meetings of the Poultry Federation**

f.     The Poultry Federation is a non-profit trade organization that represents the poultry and egg industries in Arkansas, Missouri, and Oklahoma. Many of the Defendant Processors are members of The Poultry Federation, and it conducted several meetings each year of the Class Period, which executives of Defendant Processors attended.

**7.     Monthly Exchanges of Detailed Wage and Benefits Data Through Agri Stats**

132.     Defendant Processors also exchanged detailed, timely, competitively sensitive, and non-public wage and benefits information each month through their subscriptions to Agri Stats in furtherance of the formation, implementation, and enforcement of the conspiracy.

---

[5] The term "broiler" means chicken processed for consumption.

133.    Agri Stats is a statistical research and analysis firm serving agricultural companies domestically and internationally. Since its inception in 1985, Agri Stats has become a popular management reporting and bench-marketing company for numerous industries, including the chicken industry. Its stated mission is to "improve the bottom line profitability for their participants by providing accurate and timely comparative data while preserving the confidentiality of individual companies."

134.    Agri Stats operates by gathering and distributing information obtained from chicken processors in the continental United States. By collaborating with Agri Stats, each Defendant Processor was able to obtain detailed, timely, non-public, and commercially sensitive compensation information about Class Members that they used to fix wages at artificially low levels. Each Defendant Processor and co-conspirator worked with Agri Stats during the relevant Class Period to provide it with information relevant to Class Members' wages and benefits in exchange for receiving the same detailed information about other Defendant Processors' practices.

135.    BLOOMBERG BUSINESSWEEK'S article "Is the Chicken Industry Rigged?," reported on February 15, 2017, that "Agri Stats provides chicken producers with a rare level of detail, in uncommonly timely fashion. The company's reports, portions of which Bloomberg Businessweek reviewed, contain exhaustive data about the internal operations of the nation's biggest poultry corporations, including bird sizes, product mixes, and financial returns at participating plants. … Today, at Agri Stats' headquarters in Fort Wayne, dozens of software engineers, data specialists, and marketing managers oversee one of the largest private storehouses of information ever compiled about a single sector of the agricultural economy. According to Cox, clients submit their sales invoices in real time—when someone sells a truck of chicken to the Kroger grocery chain, for example, the invoice goes to Agri Stats soon after."

136.    According to Bloomberg Businessweek, Agri Stats compiles a "special monthly document…called the Bottom Line Report which breaks down the key financial metrics," and includes very detailed and specific data about wages and benefits paid to Class Members.

137.    Like the data provided by WMS, Agri Stats provides data so sufficiently detailed that it can easily be reverse engineered despite being "anonymous." Executives of Defendant Processors are therefore able to utilize the information and easily identify which wage data belongs to which specific chicken processing plant owned by the various Defendant Processors in each region.

138.    Agri Stats subscriptions allowed Defendant Processors to ascertain the level of wages and benefits that the other subscribing processors were paying to Class Members at their chicken processing plants. This allowed Defendant Processors to fix the wages and benefits paid to Class Members, as well as ensure that no Defendant Processor deviated from the conspiracy.

139.    Sharing of this kind of wage and benefits information allowed Defendant Processors to lower wages and benefits for all Class Members below that which they would have received had there been a truly competitive market. It also served to increase profits for Defendant Processors.

140.    For example, BLOOMBERG BUSINESSWEEK'S 2017 article reported that "Armed with Agri Stats data, the biggest chicken producers have been enjoying an unprecedented era of stability and profitability. At Tyson, operating margins in the chicken division have risen sharply since 2009, when they were 1.6 percent, according to SEC filings. The next year they were up to 5.2 percent. After a brief dip, they climbed to 7.9 percent in 2014, an astounding 12 percent in 2015, and 11.9 percent in 2016. A similar trend has been under way at Pilgrim's Pride, where operating margins went from 3.08 percent in 2012 to 14.02 percent in 2014 and 12.77 percent in

2015, according to data compiled by Bloomberg. The recovery from recession accounts for some of the gains, but the poultry industry's profit margins still have been abnormally fat and long-lasting by historical standards."

141.    Agri Stats has similarly profited from its practice of collecting and disseminating Defendants Processors' confidential business information by charging substantial fees to each Defendant Processor.

142.    These information exchanges, directly and through Defendant Consulting Firms, are concerted action between horizontal competitors in the market for chicken processing plant workers.

143.    In guidance to human resources professionals, the Department of Justice ("DOJ") states that sharing information with competitors about terms and conditions of employment can be anticompetitive in that it decreases competition below competitive levels by allowing firms to match each other's compensation rather than compete for services by offering more favorable wages and benefits.

144.    The joint guidance titled "Antitrust Guidance for Human Resource Professionals" published by the DOJ and the Federal Trade Commission ("FTC") in October 2016 states:

> Sharing information with competitors about terms and conditions of employment can also run afoul of the antitrust laws. Even if an individual does not agree explicitly to fix compensation or other terms of employment, exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement. While agreements to share information are not per se illegal and therefore not prosecuted criminally, they may be subject to civil antitrust liability when they have, or are likely to have, an anticompetitive effect. Even without an express or implicit agreement on terms of compensation among firms, evidence of periodic exchange of current wage information in an industry with few employers could establish an antitrust violation because, for example, the data exchange has decreased or is likely to decrease compensation. …
> However, not all information exchanges are illegal. It is possible to design and carry out information exchanges in ways that conform with the antitrust laws. For example, an information exchange may be lawful if:

- a neutral third party manages the exchange,
- the exchange involves information that is relatively old,
- the information is aggregated to protect the identity of the underlying sources, and
- enough sources are aggregated to prevent competitors from linking particular data to an individual source.

145.    Defendants' exchange of information breaches at least three of the four criteria for employment information exchanges established by the DOJ and the FTC. First, the information exchanged concerned current and future wages and benefits not "relatively old" information. Second, the information was provided in a manner that was disaggregated rather than aggregated. Finally, Defendant Processors' executives were easily able to reverse engineer the information and identify the compensation data of individual chicken processing plants.

8.    **Structures and Characteristics of the Chicken Industry that Render the Conspiracy more plausible**

146.    The chicken industry has a number of plus factors that make it conducive to wage fixing, thereby making collusion particularly attractive. Specifically, these include, but are not limited to: (1) vertical integration; (2) high barriers to entry; (3) inelastic labor supply; (4) industry concentration; (5) fungibility of chicken processing plant labor; (6) numerous opportunities to collude; (7) close professional networks; and (8) a history of government investigations into collusive actions.

a.    **Vertical Integration**

147.    Starting in the 1950s and early 1960s, the companies responsible for the various stages of chicken processing became vertically integrated to such an extent that they became known within the industry as "integrators."[6]  Defendant Processors are integrators that own and

---

[6] Michael Ollinger Et Al., U.S. Dep't Of Agric. Econ. Research Serv., Aer-787, Structural Change In U.S. Chicken And Turkey Slaughter 17 (2000).

operate almost all stages of chicken production, beginning with the collection of live birds to slaughter and processing for distribution and consumption. Despite this, most chicken processing plants operate on relatively slim profit margins meaning labor costs account for a substantial input cost, making Defendant Processors susceptible to attempting to control it in any way that they can.[7]

148.    Defendant Processors also control a majority of the chicken processing plant employment market thereby diminishing the opportunities for employment in alternate but related segments. By virtue of vertical integration, Defendant Processors also have a significant amount of leverage within the industry, which they use to control the wages and benefits paid to Class Members.

### b.    High Barriers to Entry

149.    The chicken processing industry is characterized by high entry barriers. These barriers include the high costs of: constructing and operating a processing complex, including hatcheries, feed mills, and processing plants; establishing and operating a distribution network capable of delivering poultry products to grocery chains or wholesalers; developing and investing in a skilled contract-farmer base; and ensuring compliance with onerous federal and state government mandates and regulations. The cost of constructing a processing complex alone is in excess of $100 million. As a result, it is exceptionally expensive and logistically complex for new chicken processors to emerge and compete with Defendant Processors.

---

[7] Robert Bussel, Taking on "Big Chicken": The Delmarva Poultry Justice Alliance, 28 LAB. STUD. J. 1, 7 (Summer 2003) at 4-5 ("[E]xercising tight control over the cost of labor has long preoccupied the poultry industry and powerfully influenced employment and managerial policies.").

### c.      Inelastic Labor Supply

150.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. The market for chicken processing workers is characterized by an inelastic labor supply because of the specific demographics and background of Class Members, which are comprised largely of migrant, lower socio-economic workers. Industry-wide changes in wage and benefits do not substantially affect the rate of participation in chicken processing plant positions.

### d.      Industry Concentration

151.    A competitive market would ordinarily see chicken processing plants offering competitive compensation packages in order to attract and retain workers. This is especially true in geographic areas where plants are highly concentrated making it easy for workers to switch employers.

152.    As described above, the chicken industry is highly concentrated, especially in the Southeastern part of the continental United States. According to the National Chicken Council ("NCC"), there were 41 broiler companies in 2010 down from 55 in 1995. By 2014, there were 34 – only 20 or so having any meaningful presence. During the same time period, the concentration ratio of the chicken processing industry's top-eight-firms' increased from 53.1% in 1997 to 79.3% in 2013. Two poultry processors represent 40% of the industry according to the 2016 report by Focus Management Group.

### e.      Fungibility of Chicken Processing Plant Labor

153.    The non-supervisory production and maintenance workers that comprise the Class are fungible because workers within the same positions are generally interchangeable, allowing Defendant Processors to readily compare and match each other's compensation levels.

### f.     Numerous Opportunities to Collude

154.    The chicken industry is replete with opportunities to collude. As described, senior executives responsible for determining wage and benefits for chicken processing plant workers attended multiple in-person meetings during each year of the Class Period. In addition to the reoccurring, secret meetings at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida, there were other meetings, many sponsored by industry trade associations, or Agri Stats itself, where senior executives had the opportunity to communicate and conspire.

155.    For example, the NCC is a trade association whose officers represent a perpetual revolving door of high-ranking executives of Defendant Processors and offers a "forum in which industry members can share ideas and work towards solutions to common problems." For example, in the 2010-11 NCC cycle, the following individuals were appointed to the board of directors for three-year terms:

a. William Andersen, Keystone Foods, Huntsville, AL;

b. Robin Burruss, Tip Top Poultry, Marietta, GA;

c. Joe DePippo, Hain Pure Protein Corporation, Brevard, NC;

d. Carl George, George's, Inc., Springdale, AR;

e. Robert Johnson, House of Raeford, Rose Hill, NC;

f. Bernard Leonard, Tyson Foods, Springdale, AR;

g. Mike Roberts, Perdue Farms, Salisbury, MD;

h. Joe Sanderson, Jr., Sanderson Farms, Laurel, MS;

i. Thomas Shelton, Case Foods, Eden, MD; and

j. Jerry Wilson, Pilgrim's Pride Corporation, Greeley, CO.

156.     The U.S. Poultry & Egg Export Council also holds quarterly meetings attended by many senior executives from all or nearly all Defendant Processors. Similarly, the U.S. Poultry & Egg Association holds regular quarterly meetings, as does the Poultry Federation and the International Poultry Council.

### g.     Close Professional Networks

157.     The nature of attending a large number of industry events each year means that senior executives of Defendant Processors and other attendees have developed close professional networks. The frequent meetings and other channels of communication available to them through these networks helps the participants of the conspiracy to easily enforce and police it.

### h.     History of Government Investigations

158.     There is a long history of antitrust scrutiny in the chicken industry beginning as far back as 1973 when the DOJ filed a civil antitrust action against the National Broiler Marketing Association ("NBMA"). The DOJ alleged that the NBMA was conspiring to fix the prices of broilers in violation of Section 1 of the Sherman Act, and sought to enjoin it and its dozens of members from continuing a conference call program whereby members would coordinate on the pricing and production of broilers. The investigation led to a parallel civil class action, which ultimately settled for over $20 million in 1980.

159.     Earlier this year, the DOJ announced that it had launched a criminal antitrust investigation into whether chicken processors in the United States had conspired to reduce the supply of broiler chickens and manipulate prices based on a weekly benchmark. Defendant Processor Tyson confirmed that it received a grand jury subpoena from the DOJ on April 26, 2019, regarding the investigation. On June 21, 2019, the DOJ filed a motion requesting that the U.S. District Court for the Northern District of Illinois stay discovery in the parallel civil class involving

many of the same Defendant Processers and other chicken processors in order "to protect the grand jury investigation" into anticompetitive conduct in the chicken industry. The civil plaintiffs allege that the companies agreed to limit the supply of broiler chickens by coordinated output restrictions, and exchanged detailed information about prices and sales volume through Agri Stats, a named defendant in the suit.

**C.      Relevant Market Power**

160.    The relevant market is the employment of non-supervisory production and maintenance workers at chicken processing plants in the continental United States ("Relevant Market"). The relevant geographic market is the continental United States.

161.    Defendant Processors possess market power in the Relevant Market. Defendant Processors pay compensation to non-supervisory production and maintenance workers at chicken processing plants that comprise more than 90 percent of total broiler producing companies in the continental United States. Thus, Defendant Processors were able to profitably suppress wage and benefits below competitive levels. In such circumstances, chicken processing plant workers are not able to defeat such artificial wage and benefits suppression by mobilizing organized opposition or switching employment to other non-conspiring chicken processing companies.

162.    There are no close economic and/or functional substitutes for Class Members who work at chicken processing plants. Defendant Processors require such workers to process chickens.

163.    Each Defendant Processor provides compensation to Class Members at its chicken processing plants at identical or near identical levels, regardless of the region of the country in which the company's plants are located. Because Defendant Processors pay the same base wage and benefits to Class Members at chicken processing plants regardless of geographic region,

conduct that depresses compensation in one location would necessarily depress compensation to Class Members in all the relevant geographic regions of the continental United States.

164. Absent the conduct alleged herein, Defendant Processors would consider each other to be competitors for non-supervisory production and maintenance workers at chicken processing plants, given that Defendant Processors (a) each own and operate processing plants that are within close proximity of another Defendant Processor's chicken processing plant; (b) could open or acquire chicken processing plants in areas where another Defendant Processor already operates; and (c) would compete with each other on a nationwide basis to recruit and incentivize nonsupervisory production and maintenances workers to move to areas where Defendant Processors operate chicken processing plants.

165. Defendant Processors collectively possess market power in the Relevant Market in that they collectively have the power to depress compensation to non-supervisory production and maintenance workers at chicken processing plants below competitive levels.

**D.      Anticompetitive Effects and Injury**

166. Because of Defendants' anticompetitive conduct alleged herein, competition between Defendant Processors over wage and benefits for non-supervisory production and maintenance workers in chicken processing plants was depressed below competitive levels in the continental United States during the Class Period.

167. The anticompetitive conspiracy to depress compensation included both agreements about wage and benefits made at reoccurring, secret and other in-person meetings as well as the agreements to exchange competitively sensitive information through Defendant Consulting Firms. This had significant anticompetitive effects without any countervailing procompetitive benefits.

168.     The information sharing aspect of the conspiracy disrupted the normal competitive environment. Economic theory and antitrust jurisprudence shows that such routine and granular information exchanges reduce the intensity of price competition and artificially depress compensation below competitive levels.

169.     The alleged violations of the antitrust laws have caused Plaintiffs and the Class to sustain injuries, having received lower wages and benefits during the Class Period than they would have received in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiffs and the Class have suffered injury of the type that the antitrust laws were designed to punish and prevent.

170.     At the same time as wages and benefits paid to Plaintiffs and the Class were being artificially depressed, the productivity of those workers greatly increased, primarily because processing line speeds were substantially increased. As a result, even though Plaintiffs and the Class worked harder during the Class Period, the wages and benefits received by them did not reflect this.

171.     Yet, compensation for poultry executives is rapidly increasing. For example, the Chairman of Tyson's pay rose 260 percent in the last four years to $8.8 million and compensation for Pilgrim's president and chief executive officer rose 290 percent to $9.3 million, despite wages at chicken processing plants declining dramatically—almost 40 percent since the 1980s according to Oxfam America's 2015 report titled "Lives on the Line."

## CLASS ALLEGATIONS

172.     Plaintiffs bring this action on behalf of themselves and the Class under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3).

173.     Plaintiffs do not yet know the exact size of the Class because such information is in the exclusive control of Defendants and their co-conspirators. The Class can be easily identified and is one for which records should exist.

174.     Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

175.     As there are likely hundreds of thousands of Class Members, joinders of all Class Members is therefore impracticable.

176.     Questions of law or fact common to the Class include but are not limited to:

a. whether Defendants' conduct violated the Sherman Act;

b. whether Defendants engaged in an agreement, combination, or conspiracy to fix, depress, maintain, or stabilize the wages and benefits paid to Class Members;

c. whether Defendants' conspiracy and associated agreements, or any of them, constitute a *per se* violation of the Sherman Act;

d. whether Defendants' exchange of detailed, timely, competitively sensitive, and non-public information about wages and benefits paid to Class Members constitutes, or furthered, an agreement, combination, or conspiracy in restraint of trade;

e. whether Defendants' conspiracy and associated agreements have restrained trade, commerce, or competition for skilled labor among Defendant Processors and their co-conspirators;

f. whether Defendants have fraudulently concealed their conduct;

g. whether Plaintiffs and the Class have suffered antitrust injury;

h. whether, and to what extent, Defendants' conduct depressed wages and benefits paid to Class Members below competitive levels;

i. the nature and scope of injunctive relief necessary to restore competition;

j. the identity of the participants of the alleged conspiracy;

k. the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

l. the difference between the total compensation Plaintiffs and Class Members received from Defendant Processors and their co-conspirators, and the total compensation Plaintiffs and Class Members would have received from Defendant Processors and their co-conspirators in the absence of the illegal acts and conspiracy alleged herein; and

m. the type and measure of damages suffered by Plaintiffs and the Class.

177.    Questions of law or fact common to the Class Members predominate over questions, if any, affecting only individual Class Members.

178.    Plaintiffs' claims are typical of those of the absent Class Members and arise from the same common course of conduct and the relief sought is common to the Class.

179.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

180.    Plaintiffs will fairly and adequately represent the interests of the Class and have no conflict with the interests of the Class.

181.    Plaintiffs have retained counsel experienced in the prosecution of complex antitrust and class action litigation.

182.    This class action is superior to any alternatives for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual members of the Class would create the

risk of inconsistent or varying adjudications, and be inefficient and burdensome to the parties and the Court. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution means that without a class action it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Accordingly, the benefits of proceeding through the class mechanism substantially outweigh any difficulties that may arise in management of this class action.

**PLAINTIFFS' CLAIMS ARE NOT BARRED BY**
<u>**THE STATUTE OF LIMITATIONS**</u>

**A.    The Statue of Limitations Did Not Begin to Run Because Plaintiffs and the Class Did Not And Could Not Discover their Claims**

183.    Plaintiffs and Class Members had no actual or constructive knowledge of the breadth and scope of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein and could not have discovered it through the exercise of reasonable diligence.

184.    Chicken processing plants and compensation to chicken processing plant workers are not exempt from antitrust regulation, thus Plaintiffs and Class Members reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of wages and benefits paid by Defendant Processors to non-supervisory production and maintenance workers in chicken processing plants in the continental United States. This is especially so given that many Class Members are foreign-born and non-citizens, and are therefore likely to have a lower level of awareness and access to current news articles circulating in the United States, particularly those that are written in English.

185.     Plaintiffs and Class Members have been continuously injured and will continue to be injured in the form of receiving lower wages and benefits than those that they would have been paid in the absence of the conspiracy. Defendants repeatedly violated Plaintiffs and the Class Members' interests by reaffirming the conspiracy described herein throughout the Class Period. Plaintiffs have no knowledge, or information to suggest, that the anticompetitive conduct has ceased.

186.     Therefore, the statute of limitations could not have begun to run because Plaintiffs and Class Members did not, and could not, discover their claims.

**B.      Defendants Fraudulently Concealed the Conspiracy**

187.     Application of the doctrine of fraudulent concealment tolled and suspended the statute of limitations on the claims asserted herein by Plaintiffs and Class Members. Plaintiffs and Class Members did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein because of the deceptive practices and secrecy employed by Defendants and their co-conspirators to conceal their anticompetitive conduct.

188.     Plaintiffs and Class Members were unaware of Defendants' unlawful conduct, and did not know that wages and benefits were fixed. No information, actual or constructive, was made available to Plaintiffs and Class Members that even hinted that they were being injured by Defendants' unlawful conduct.

189.     The very nature of the secret conspiracy was such that it did not reveal itself in any way that would put Plaintiffs or the Class on inquiry notice that there was an agreement to fix and depress wages and benefits paid to non-supervisory production and maintenance workers in chicken processing plants.

190.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were concealed and carried out in a manner that precluded detection by, for example, conducting reoccurring, secret meetings.

191.    Defendant Processors also made affirmative and false statements that they paid the wages and benefits expected in a competitive market for chicken processing plant workers. For example, in October 2015, in response to a report from Oxfam America investigating working conditions in chicken processing plants in the United States, Defendant Tyson said "We believe in fair compensation, a safe and healthy work environment and in providing workers with a voice." Defendant Perdue also responded to the Oxfam America report by stating in October 2015 that the company provides "competitive wages" above minimum wage. That same month, the NCC and U.S. Poultry & Egg Association, the two leading trade associations that are controlled by, and represent the interests of, Defendant Processors, issued a joint statement that provided: "Poultry processing plants compete for the local workforce and therefore must pay competitive wages and offer competitive benefits. … Poultry processing companies offer competitive insurance benefits that includes family and dependent coverage." These false representations were used to conceal the conspiracy.

192.    Defendant Processors advertised that their wages and benefits were "competitive." For example, public advertisements by Tyson stated that its compensation is "competitive" and the company website states, under the title "Fair Compensation" section: "We offer employees competitive pay and benefits…" Similarly, Perdue advertises on its website: "We offer competitive wages and a comprehensive benefits package…" These statements falsely indicate that the companies determine compensation through competing in the labor market with other Defendant Processors.

193.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and Class Members had no knowledge of the alleged conspiracy or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

194.    For these reasons, the statute of limitations applicable to Plaintiffs and the Class Members' claims was tolled and suspended and did not begin to run.

<u>**CAUSES OF ACTION**</u>

**FIRST CLAIM FOR RELIEF**
**CONSPIRACY TO DEPRESS COMPENSATION**
**In Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

195.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

196.    Beginning in January 1, 2009, and continuing through the present, Defendants and co-conspirators entered into and engaged in a continuing contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

197.    The acts done by each Defendant as part of, and in furtherance of the contract, combination, or conspiracy were authorized, ordered, or done by, their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

198.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, depress, maintain, and stabilize the wages and benefits paid to Class Members employed at Defendant Processors' chicken processing plants in the continental United States, thereby creating anticompetitive effects.

199.    As a result of Defendants' unlawful conduct, Plaintiffs and Class Members have been harmed by being denied competitive levels of wages and benefits for their employment for

non-supervisory production and maintenance positions at Defendant Processors' chicken processing plants throughout the continental United States.

200.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein:

a.    Reached agreements, by participating in reoccurring, secret in-person meetings and conversations, exchanges of information and other communications, to fix, depress, maintain and stabilize the wages and benefits paid to non-supervisory production and maintenance workers at Defendant Processors' chicken processing plants in the continental United States;

b.    Implemented, monitored and enforced the conspiracy to depress compensation through the regular exchange of detailed, timely, competitively sensitive, and nonpublic information about wage and benefits data with the assistance of Agri Stats and WMS; and

c.    Paid depressed wages and benefits, which were fixed by Defendant Processors, to non-supervisory production and maintenance workers at chicken processing plants in the continental United States.

201.    Defendants' conspiracy had the following anticompetitive effects, among others:

a.    Price competition in the market for retaining and hiring of Class Members at Defendant Processors' chicken processing plants has been restrained, depressed, and/or eliminated in the continental United States; and

b.      Wages and benefits paid to Class Members employed at Defendant Processors' chicken processing plants have been fixed, maintained, and stabilized at artificially depressed levels throughout the continental United States.

202.    Plaintiffs and Class Members have been injured and will continue to be injured by receiving less in wages and benefits from Defendant Processors than they would have in the absence of the combination and conspiracy.

203.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## SECOND CLAIM FOR RELIEF

### CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION
### In Violation of Section 1 the Sherman Act (15 U.S.C. § 1)

204.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

205.    Beginning in January 1, 2009, and continuing through to the present, Defendants and their co-conspirators entered into an agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation of non-supervisory production and maintenance workers at chicken processing plants in the continental United States in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

206.    The Relevant Market is the employment of non-supervisory production and maintenance workers at chicken processing plants in the continental United States defined herein, and the relevant geographic market is the continental United States.

207.    Defendant Processors possess market power in the Relevant Market. Defendant Processors employed hundreds of thousands of workers at chicken processing plants during the Class Period, and collectively represent over 90 percent of the total broiler producing companies

in the continental United States. Defendant Processors therefore have the power to jointly set compensation for Class Members below competitive levels.

208.    Defendants depressed compensation paid to Class Members employed at chicken processing plants in the continental United States below competitive levels. Class members could not defeat such artificial depression by switching employment.

209.    A decrease in wages and benefits paid to Class Members from a competitive level will not cause workers to switch employment to non-chicken industries. Many of these workers are constrained from switching employment to non-poultry industries because of their legal status; limited education, language, or professional skills; the absence of job opportunities; and the expense of moving.

210.    The Class Members are considered fungible by Defendant Processors because workers within the same positions are generally interchangeable, allowing Defendant Processors to readily compare and match each other's compensation levels.

211.    The information regularly exchanged by Defendants as part of the conspiracy consisted of detailed, timely, competitively sensitive, and non-public information about current and future wages and benefits for Class Members, including:

        a.    Using Agri-Stats as a conduit to exchange, at least on a monthly basis, effective hourly wages for each category of Class Member at chicken processing plants in the continental United States operated by Defendant Processors;

        b.    Using the WMS survey to exchange, on at least a yearly basis, details of benefits and hourly wages provided to each category of Class Member at chicken processing plants in the continental United States operated by Defendant Processors;

212.     Each Defendant Processor entered into agreements with Defendant Consulting Firms Agri Stats and WMS. Defendant Processors would not have provided detailed, timely, competitively sensitive, and non-public wage and benefit information to Agri Stats or WMS, or directly to another Defendant Processor, unless they expected to receive comparable information from other Defendant Processors in return.

213.     Defendant Processors used this information to depress wages and benefits, as well as to eliminate a major incentive for Defendant Processors to increase compensation, to Class Members working at their chicken processing plants.

214.     Frequently exchanging wage and benefits information allowed competitors to know the precise compensation rates at competitor plants as well as any plans for increasing compensation, while at the same time workers and new applicants lacked access to any form of corresponding information.

215.     This eliminated any need or incentive to outbid a competitor for employees during the Class Period because Defendant Processors knew of changes and could respond accordingly. Having access to detailed wage and benefits information removed any uncertainty that a competitor might be offering and providing better compensation in the labor market. Without this uncertainty, employers need not compete for employees via compensation packages.

216.     The numerous opportunities to exchange information through Agri Stat, WMS and other industry events led to senior executives developing a high degree of trust among themselves and to the formation of close professional networks. This made it easier for Defendant Processors to use the information to match (and not exceed) each other's compensation levels for Class Members during the Class Period.

217.    The exchange of wage and benefit information in this way - disaggregated, company specific, current and forward-looking, and easily traceable - was not reasonably necessary to further any procompetitive purpose. Doing so reduced competition among Defendant Processors in the compensation of Class Members employed at their chicken processing plants in the continental United States, and allowed Defendant Processors to artificially depress the compensation of those Class Members.

218.    Because of the unlawful agreement alleged herein to exchange compensation information, Plaintiffs and Class Members have been injured by receiving artificially depressed wages and benefits during the Class Period.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and the Class respectfully requests the following relief:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every Class Member;

B.      That Defendants' unlawful actions alleged herein be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      That Plaintiffs and Class Members recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      That Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      That Plaintiffs and Class Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

F.      That Plaintiffs and Class Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

G.      That Plaintiffs and Class Members be granted such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

Dated:  October 16, 2019              /s/ *Paul Mark Sandler*
                                      Paul Mark Sandler (Bar No. 00145)
                                      Eric R. Harlan (Bar No. 23492)
                                      **SHAPIRO SHER GUINOT & SANDLER, P.A.**
                                      250 West Pratt Street, Suite 2000
                                      Baltimore, Maryland 21201
                                      Tel: (410) 395-0202
                                      Fax: (410) 539-7611
                                      pms@shapirosher.com
                                      erh@shapirosher.com

**GLANCY PRONGAY & MURRAY LLP**
Brian P. Murray (*pro hac vice* forthcoming)
Lee Albert (*pro hac vice* forthcoming)
Gregory Linkh (*pro hac vice* forthcoming)
230 Park Avenue, Suite 530
New York, New York 10169
Tel: (212) 682-5340
Fax: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com
glinkh@glancylaw.com


**EMERSON FIRM, PLLC**
John G. Emerson (*pro hac vice* forthcoming)
830 Apollo Lane
Houston, Texas 77058
Tel: (800) 551-8649
Fax: (501) 286-4659
jemerson@emersonfirm.com
*Attorneys for Plaintiffs*